489 F.2d 308
 Leroy C. COOPER, Appellant,
v.
A. L. LOCKHART, Superintendent of the Cummins Unit of the
Arkansas Department of Corrections; Terrell Don
Hutto, Individually and as Commissioner
of Corrections for the State
of Arkansas, Appellees.
Harry L. WILLIAMS, Jr., Appellant,
v.
A. L. LOCKHART, Superintendent, Cummins Unit, Arkansas
Department of Corrections, Appellee.
 Nos. 73-1536 and 73-1584.
 United States Court of Appeals, Eighth Circuit.
 Submitted Oct. 18, 1973.
Decided Dec. 27, 1973.
 
 John T. Lavey, Little Rock, Ark., for appellant in No. 73-1536.
 Harry Williams, Jr., on brief, pro se in No. 73-1584.
 Jim Guy Tucker, Atty. Gen., Little Rock, Ark., and Alston Jennings, Asst. Atty. Gen., on brief for appellees in Nos. 73-1536 and 73-1584.
 Before LAY, BRIGHT and WEBSTER, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 A significant question in the corrections field is presented by these appeals. The fundamental issue is whether the punitive effects of a detainer, placed on a prisoner by the State of Arkansas because of a pending parole revocation in another state, may be continued when the latter state refuses to determine the question of revocation until the prisoner is released from his present confinement. The constitutional question posed is whether the due process requirements of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), as applied to parole revocation require a timely hearing and disposition by the parole state when the parolee is in the custody of another state.
 
 JURISDICTION
 
 2
 The trial court based its jurisdiction on 42 U.S.C. 1983. The court was troubled over the possible application of Preiser v. Rodriguez, 411 U.S. 475, 92 S.Ct. 1827, 36 L.Ed.2d 439 (1973), and whether petitioners' remedy lay in habeas corpus rather than under 1983 of the Civil Rights Act. In view of the delay that would follow from state exhaustion, the district court determined that, even if the complaint was to be construed as a habeas corpus action, it would nonetheless exercise its jurisdiction. We find the reasoning of Rodriguez inapplicable and determine that the district court properly entertained the petitioners' claim under 1983. Rodriguez requires a prisoner's claim which is premised on the loss of good time credit to proceed by habeas corpus under 28 U.S.C. 2254 rather than under the Civil Rights Act. The reasoning of the Supreme Court is that loss of good time credit relates to custody rather than to conditions of confinement. Here the alleged constitutional deprivation relates to the conditions of a prisoner's confinement, cognizable under 1983. Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971).
 
 FACTUAL HISTORY
 
 3
 Plaintiffs, Leroy C. Cooper and Harry L. Williams, Jr., were both represented in the federal district court by the same counsel, Mr. John T. Lavey of Little Rock, Arkansas. Mr. Lavey appealed Cooper's case. Williams has filed his appeal pro se. The issues developed in the trial court are identical in both Cooper's and Williams' cases. However, the posture of Cooper's case has materially changed on appeal, and as a result his case must be dismissed as moot.
 
 
 4
 In 1968 Cooper received a five-year sentence in the State of Missouri and was subsequently paroled in 1970. A short time later he was convicted of a felony in the State of Arkansas and confined to the Arkansas State Prison. The State of Missouri on October 21, 1970, issued a parole violation warrant against Cooper. On March 16, 1971, the State of Arkansas placed a detainer against Cooper in favor of 'Jefferson City, Missouri for Parole Violation.' The detainer placed against Cooper was not based on the Arkansas felony conviction but on other factual grounds.[1] On April 30, 1973, Cooper wrote a letter to the Missouri Board of Parole requesting a revocation hearing within 60 days. On May 7, 1973, a Board member advised him that no revocation hearing could be held until he was released from the Arkansas prison and returned to Missouri. On June 14, 1973, petitioner filed an amended complaint alleging inter alia the detainer placed on him was illegal since the State of Missouri had refused to give him a revocation hearing within a reasonable time.[2] The state answered that the court lacked jurisdiction since the State of Missouri was not before the court and was an indispensable party.
 
 
 5
 The district court pointed out that the State of Missouri was not a necessary party to the suit; that it would allow the State of Missouri to intervene but Missouri never made any request to do so. The court found that if the petitioner was entitled to relief, it could be obtained by operation of the court's decree on the parties before it. These defendants are Terrell Don Hutto, Commissioner of the Arkansas Department of Correction and A. L. Lockhart, Superintendent of the Cummins Prison Unit in Arkansas, where Cooper was then incarcerated and Williams is still confined.
 
 
 6
 The factual details of Williams' case are not as fully developed in the record; however, the trial court found the issues to be identical to Cooper's. The record does disclose that Williams was a parolee from the State of Michigan when subsequently convicted of a felony in the State of Arkansas. Thereafter, the State of Michigan requested a detainer with the State of Arkansas for possible parole revocation and requested that it be notified when Arkansas released Williams. Williams alleges, in his pro se brief, that in April of 1973, the Michigan Board of Parole informed the Attorney General of Arkansas that it would not give Williams a parole revocation hearing until he was released by Arkansas. In addition, we also rely on the trial court's assumption that Williams has demanded a speedy hearing in Michigan and that the same was denied. The trial court additionally found that neither Cooper's nor Williams' parole had been actually revoked at the time of its opinion.[3]
 
 
 7
 At this juncture, we come back to our earlier assertion that Cooper's posture on appeal is materially different The trial court noted that Cooper would be eligible for release from the Arkansas Penitentiary on October 28, 1973. This appeal was argued in early October and we requested the parties to inform this court as to the possible release of Cooper at that time. We have now received a letter from the Assistant Attorney General of the State of Arkansas, Alston Jennings, Jr., that Cooper was in fact released from Arkansas custody on October 26, 1973, to the Missouri authorities on the basis of the detainer. Upon these facts, we find that Cooper's case is moot and must accordingly be dismissed. Williams' minimum release date from the Arkansas prison is November 8, 1975; thus his case still presents a viable issue.
 
 
 8
 The determination of mootness in Cooper's case helps crystallize the jurisdictional basis and the actual issue before us. It is apparent that the district court, in dismissing both complaints, viewed this case in terms of whether the Missouri authorities must grant Cooper, and whether the Michigan Board of Parole must grant Williams, a 'speedy trial' in the form of a revocation hearing. On this basis the district court properly analyzed Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), and Braden v. 30th Judicial Cir., 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), and found that the Sixth Amendment guaranteeing the right to a speedy trial[4] was limited to 'another pending criminal charge' and not to a parole revocation warrant. See also Gagnon v. Scarpelli, 411 U.S. 778, 781, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
 
 
 9
 We view the issue to be much broader. The issue before us is whether the custodial state may be required to remove the harmful consequences which flow from the detainer if a parole revocation hearing is not granted while the prisoner remains in its custody. It is significant that it is the custodial state which places the detainer on the prisoner, not the state which makes the request for one. We know of no legal obligation on the custodial state to place a detainer on the prisoner because of the issuance of a parole violation warrant by another state.[5] Even if there is, the fact that the custodial state cooperates with the requesting state in turning the prisoner over at release is not the thrust of the attack. The relief sought is from the alleged punitive consequences which surround the prisoner in his day-to-day imprisonment in the custodial state when a detainer is placed upon him. Thus, we conclude that Cooper's release by Arkansas on October 28, 1973, now removes him from the restrictions imposed by the Arkansas authorities by the detainer. However, as indicated, this is not so as to Williams.
 
 DUE PROCESS AS APPLIED TO PAROLE REVOCATION
 
 10
 We therefore move to the issues as they relate to Williams. First, we are faced with the fundamental question of whether there exists in the circumstances presented a denial of due process. We find there is. The law is now established that due process is required in parole revocation proceedings. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The issue is then simply whether there should exist an exception for a parole violator who is incarcerated in another state.
 
 
 11
 The district court reasoned that the applicability of Morrissey was not before it since the due process requirements applied only to the state which must hold the parole revocation hearing. The court found that the requirements of Morrissey come into play only at such time as the petitioner is brought before a Board of Parole for a revocation hearing. Thus, the district court reasoned the questions of notice, opportunity to be heard, and determination by a fair fact finder are issues over which the defendants in the present case can have no control.[6] First, it is important to recognize that Morrissey contemplates that due process for a parolee includes not only the above mentioned rights, but as well, an opportunity to be heard within a reasonable time of the alleged parole violation. Morrissey indicates that when a parole officer makes a decision that a violation of parole has occurred, 'due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available.' Morrissey, at 485, 92 S.Ct. at 2602.
 
 
 12
 The concept of a speedy trial as embodied within the Sixth Amendment to the United States Constitution was recognized to be so basic to a fair trial that it was set forth in a separate amendment.[7] However, the speedy trial clause's applicability only to actual criminal prosecutions does not mean that the due process clause rejects a prompt and timely hearing in other procedures, formal or informal. Dim memories and disappearance of witnesses can well affect the outcome of a parole revocation hearing as much as any criminal trial. Delay in any procedure may well affect its fundamental fairness. Cf., e.g., Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). As stated in Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965):
 
 
 13
 A fundamental requirement of due process is 'the opportunity to be heard.' . . . It is an opportunity which must be granted at a meaningful time and in a meaningful manner.[8]
 
 
 14
 We then come to the district court's reasoning that the timeliness of the hearing is solely within the control of the state seeking arrest and not the custodial state.[9] This analysis overlooks the factual circumstance which actually exists. Realistically, due to its detainer, it is the custodial state which has placed the added punitive restrictions on the prisoner. In this sense, it would be judicial sophistry not to find that the custodial state is acting in full concert with the state which refused to promptly process its pending review of parole revocation. The Supreme Court has recognized this principle, stating that the custodial state 'acts as agent for the demanding State . . ..' Braden, 410 U.S. at 498-499, 93 S.Ct. at 1131. In applying the due process requirements of Morrissey, we think it essential to remember that 'whether any procedural protections are due (in any particular situation) depends on the extent to which an individual will be 'condemned to suffer grievous loss." Morrissey, 408 U.S. at 481, 92 S.Ct. at 2600. In the instant case failure to provide a timely revocation hearing may not only result in prejudice to the individual in the state seeking the revocation but the failure may also result in the prisoner suffering a 'grievous loss' while confined in the Arkansas prison system. Under these circumstances it is not possible to completely separate the custodial state from the state requesting the detainer.
 
 
 15
 The parties have stipulated on appeal that the following punitive consequences during imprisonment in Arkansas flow from the placement of the detainer by the Arkansas Department of Corrections. The petitioner is:
 
 
 16
 (1) Ineligible to participate in the vocational training program because of a federal regulation attached to the granting of federal funds; (2) Ineligible to attain the classification of trustee; (3) Ineligible to participate in the meritorious furlough program because only trustees can take part; (4) Ineligible to participate in the work release program.
 
 
 17
 As the Arkansas Attorney General conceded in oral argument, a prisoner with a detainer placed on him simply 'exists' in the Arkansas prison system.[10]
 
 
 18
 It has been urged that the possible loss of individual liberty, which was the focal thrust of Morrissey, is not present in a detainer situation because the individual is already incarcerated. In other words, regardless of any favorable decision as to the parole revocation, that decision cannot affect the present confinement. This argument, we think, violates the intended spirit of Morrissey and the later decision of Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).
 
 The Supreme Court has observed:
 
 19
 Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions . . .. And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.
 
 
 20
 Morrissey, 408 U.S. at 484, 92 S.Ct. at 2601. In Gagnon, the Court emphasized that the state not only has interests in accurate findings of fact and an informed use of discretion, but that in addition the state should make certain 'that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community.' Gagnon, 411 U.S. at 785, 93 S.Ct. at 1761.[11]
 
 
 21
 In Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), the Supreme Court discussed the effect of a detainer requested by another state when the latter delays the trial on a separate criminal offense. The Supreme Court said:
 
 
 22
 The possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed.
 
 
 23
 Smith, at 378, 89 S.Ct. at 577.
 
 
 24
 This possibility is just as much obscured and 'forever lost' if a parole revocation hearing is postponed. Similarly, the Smith Court appreciated the grievous loss to a prisoner as well as to the state by the use of a detainer. The Court quoted from a former Director of the Federal Bureau of Prisons who said:
 
 
 25
 It is in their effect upon the prisoner and our attempts to rehabilitate him that detainers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement.
 
 
 26
 Smith, at 379, 89 S.Ct. at 578.
 
 
 27
 In summary, we find the cooperating custodial state denies the prisoner due process by continuing the effects of a detainer placed on him solely on the strength of a request for one made by a sister state. Thus, we hold that the special conditions of Williams' confinement automated by the filing of the detainer must be discontinued in the event that Michigan, upon reasonable notice being given, does not request that Williams be made available for prompt disposition of the parole revocation proceeding.
 
 THE EFFECT OF AN EARLY HEARING
 
 28
 It is possible to argue (1) that a revocation hearing is needless since in most every case the detainer request will be placed because the petitioner has violated his parole through conviction of another felony and (2) that the practical barriers, including the expense involved in holding a revocation hearing when the individual is confined in another state, will outweigh the benefits of possibly removing the effects of the detainer.
 
 
 29
 The first consideration could be a real one, if it were a foregone conclusion that revocation and reincarceration would always result. However, this is not so. There are many possible alternatives. First, notwithstanding the conviction in another state, the Board of Parole may well waive revocation. This often occurs today but the decision to waive revocation is not decided until the prisoner is about to be released by the detainer state.[12] The result is that because of the detainer, the prisoner is released without having been given the opportunity for rehabilitation in prison.[13]
 
 
 30
 Second, the argument that parole revocation and imprisonment will automatically follow upon release overlooks the concern of the Supreme Court 'that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving . . ..' Smith, at 378, 89 S.Ct. at 577. In Williams' case, if the Michigan Board of Parole would determine that the remaining time on Williams' Michigan sentence could be served concurrently with his Arkansas sentence, the detainer would be removed and Williams would become eligible for the rehabilitation programs within the Arkansas prison system. It may well be that the State of Michigan will reject that alternative and simply decree that Williams be returned to Michigan and complete his time.[14] But the point is that this should not be the inevitable result.[15]
 
 
 31
 We also do not believe that a state which is required to give a parole revocation hearing earlier than it would like will act more vindictively and in every case revoke parole and require the ultimate return of the prisoner. To do so would be to ignore the needs ot the state as well as the individuals. Indeed, the economics of maintaining an overcrowded prison would early catch up with the state. Cf. the dissenting opinion in Morrissey v. Brewer, 443 F.2d 942, 959 n. 16 (8th Cir. 1971), rev'd, 408 U.S. 471, 92 S.Ct. 568, 30 L.Ed.2d 552 (1972).
 
 
 32
 We turn then to the practical objection. We think the discussions found within Morrissey and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), govern here. The Court in Morrissey and Gagnon envisioned that there would be some disruptive impact which would inevitably follow from the ruling that due process was required for parole and probation revocation. The Court in Gagnon foresaw some modification of the Interstate Compact as relieving the technical hurdles. Gagnon, at 782-783 n. 5, 93 S.Ct. 1756. But more importantly, the Court emphasized the flexibility which would be allowed in a probation revocation proceeding. Id. As the Supreme Court observed in Gagnon:
 
 
 33
 While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in Morrissey intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the Morrissey requirements.
 
 
 34
 Gagon, at 783 n. 5, 93 S.Ct. at 1760.
 
 
 35
 Here, for example, the custody state and the state requesting detainer might work out informal procedures that would furnish the latter with adequate information on which to exercise its judgment whether or not to continue the detainer and press for parole revocation against the prisoner. Should the detainer-requesting state choose to pursue revocation the two states might still work out procedures which would comply with the requirements of Morrissey, but which, nevertheless, cast no great burden of time or expense upon either state.
 
 
 36
 We dismiss the appeal of Leroy C. Cooper as moot; we reverse and remand the case of Harry L. Williams, Jr. The district court is ordered to determine an appropriate and reasonable time from the date of our remand for the Arkansas authorities to notify the Michigan Board of Parole or the requesting authority of this decision and to provide a reasonable opportunity for them to hold a parole revocation hearing. In the event a hearing is held and the parole is revoked with a request by Michigan for Williams' ultimate release to it, the State of Arkansas is at liberty to continue the detainer if it so chooses. In the event that Michigan does not request Williams' return to it, or in the event that no hearing is held in accord with the principles of due process set forth here, Arkansas shall be ordered to provide the prisoner with the same opportunities given the other prisoners not subject to a detainer.[16]
 
 
 37
 Judgment reversed and remanded with directions.
 
 
 
 [1]
 The grounds as set forth in the Missouri arrest warrant read:
 
 
 [1]
 (Vltn. Rule #1). Failure to notify PO of change of place of residence or loss of employment. 2. (Vltn. Rule #2). Failure to obtain advance permission of parole officer before quitting job or changing employment. 3. (Vltn. Rule #3). Failure to obtain advance pmsn from parole officer before leaving area in w/Absconding living. 4. (Vltn. Rule #11)
 Failure to report to parole officer as directed. 5. (Vltn. Rule #15). Failure to follow the directives of parole officer.
 
 
 [2]
 Plaintiff earlier brought his suit before making a request for such a hearing to the Missouri authorities. It was dismissed as premature. Thereafter Cooper made the request for a hearing to the Missouri Board of Parole and was refused; at that time, petitioner renewed his suit in the district court
 
 
 [3]
 There is some confusion in the record on this finding in the Williams case. The State of Arkansas originally responded that Williams' parole had been earlier revoked by the State of Michigan on November 16, 1971. This was denied by the petitioner. We can only rely here on the trial court's finding that the parole has not been revoked. This finding is not attacked by the state on appeal
 
 
 [4]
 In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense
 U.S.Const. Amend. VI.
 
 
 [5]
 See the Interstate Agreement on Detainers as it applies to arrests and indictments relating to new offenses as adopted by the 1971 Arkansas State Legislature. Ark.Stat.Ann. 43-3201 (Supp.1971)
 
 
 [6]
 But see Braden v. 30th Judicial Cir., 410 U.S. 484, 499, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), where jurisdiction to process the claim of denial of speedy trial is recognized not only in the custodial state, but as well in the state which has pending criminal charges
 
 
 [7]
 A thorough discussion of the historic origins and the importance of the Sixth Amendment can be found in Klopfer v. North Carolina, 386 U.S. 213, 223-226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)
 
 
 [8]
 As Mr. Justice Cardozo observed many years ago, 'the effect of the postponement of a remedy would be equivalent to a denial of justice altogether . . ..' Thomann v. Rochester, 256 N.Y. 165, 176 N.E. 129, 132 (1931). And as early recognized by the Supreme Court, 'promptness of decision . . . in all judicial actions is one of the elements of justice.' Forsvth v. Hammond, 166 U.S. 506, 513, 17 S.Ct. 665, 668, 41 L.Ed. 1095 (1897)
 
 
 [9]
 The Supreme Court was faced with the issue of two possible jurisdictions in both Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), and Braden v. 30th Judicial Cir., 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973). Smith was a federal prisoner incarcerated in the federal penitentiary at Leavenworth, Kansas, seeking a speedy trial from the State of Texas. Braden, imprisoned in Alabama and requesting the State of Kentucky to grant him a speedy trial, brought his action in the District Court for the Western District of Kentucky. Notwithstanding the place of imprisonment, the Supreme Court observed in Braden:
 Kentucky must 'attempt to effect the return of a prisoner from a foreign jurisdiction for trial on pending state charges when such prisoner so demands . . .. Since it is the State of Kentucky which must take action, it follows that jurisdiction rests in this district which has jurisdiction over the necessary state officials.' Braden, at 487, 93 S.Ct. at 1126.
 
 
 [10]
 Punitive consequences of a detainer placed on the prisoner vary from one institution to another. The generally recognized ones include the following restrictions: the inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle them to additional good time credits against their sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities. See generally Goldfarb & Singer, Redressing Prisoners' Grievances, 39 Geo.Wash.L.Rev. 175, 228-230 (1970); Jacob & Sharma, Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process, 18 Kan.L.Rev. 493, 578-589 (1970); Tuttle, Catch 2254: Federal Jurisdiction and Interstate Detainers, 32 U.Pitt.L.Rev. 489 (1971); Note, Detainers and the Correctional Process, 16 Wash.U.L.Q. 417 (1966)
 As one commentator has observed:
 Many of the system's inadequacies stem from the fact that it was developed by administrators for administrators, with little interference from courts or legislatures. It is, therefore, not surprising that convenience and expediency are its main concerns, rather than protection of the rights and welfare of individual detainees. Lack of regulation and meager or nonexistent requirements for filing a detainer leave the system open to much abuse, adding to the gravity of the problem.
 Note, 16 Wash.U.L.Q. 417, 436 (1966).
 It was further noted that: Both the detainee and society stand to gain from prompt adjudication. The uncertainty about the detainee's future will be removed, and intelligent planning of a program of rehabilitation will become possible. The cooperation of the inmate should be substantially increased for the same reasons.
 Id. at 437.
 The primary goal in solving the detainer problem is to insure to the extent possible, identical treatment of one accused of multi-jurisdictional offenses, and one accused of the same crimes against a single jurisdiction.
 Id. at 489.
 
 
 [11]
 The 1947 Handbook on Interstate Crime Control focuses on detainers and the problems they present for rehabilitation:
 We know now that the prison administrator's task is to rehabilitate the offender and to make plans for him to return to the community as a self-respecting, lawabiding citizen. However, this task is difficult to accomplish in many cases because we have allowed the detainer, inherited from medieval thinking, to remain in our law enforcement system without making adjustments necessary to prevent hampering of the modern correctional system.
 While it would seem proper that authorities in quest of a violator of the law should have every assistance in returning him to their jurisdiction, nevertheless the detainer system now operates to the detriment of society all too often. The difficulties inherent in the existing detainer system affect the judges, the institutional officials, the paroling authorities and the individual himself.
 The prison administrator is thwarted in his efforts toward rehabilitation. The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalism and the objective of the correctional system is defeated.
 Quoted in Lawrence v. Blackwell, 298 F.Supp. 708, 713-714 (N.D.Ga.1969).
 
 
 [12]
 It has been observed that thirty per cent or more of the inmates in federal penitentiaries have at least one detainer outstanding against them and many prisoners have more than one detainer. At the same time there are many prison inmates who have charges pending against them for which detainers have not yet been filed. Another study revealed that approximately five hundred inmates in the Missouri State Penitentiary have detainers filed against them. Yet in spite of these figures the authorities are in agreement that less than one-half of all detainers which ard filed are ever exercised and many of these are filed with no intention of ever trying to enforce them. Many of the detainers are filed for punitive reasons, to curtail prison privileges or to prevent parole. Thus the inmate is punished for the offense though he has not been tried or convicted and then the charges are later withdrawn or not enforced. Since detainers do not bind a requesting official, a prisoner may not know until his actual release whether the detainer will be enforced or not-- when the requesting officials or their agents either show up or simply fail to appear. If they do not show up the inmate is set free. See Jacob & Sharma, Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process, 18 Kan.L.Rev. 493, 578-579 (1970); Note, Detainers and the Correctional Process, 16 Wash.U.L.Q. 417 (1966)
 
 
 [13]
 One court in discussing detainers made the following observation:
 It has previously come to the Court's attention that after some prisoners have served their extended and extra oppressive Federal terms because of such detainers, the State then never has prosecuted them. Attempts at rehabilitation, treatment and a gradual, supervised readjustment to free life are, in such cases, obviously completely defeated.
 The universal effect of these detainers, however, regardless of the intent, is to stultify the Federal course of treatment designed to reform the offender during his incarceration.
 United States v. Candelaria, 131 F.Supp. 797, 805 (S.D.Cal.1955). See also Lawrence v. Blackwell, 298 F.Supp. 708, 713-714 (N.D.Ga.1969); Tuttle, Catch 2254: Federal Jurisdiction and Interstate Detainers, 32 U.Pitt.L.Rev. 489, 491 (1971).
 
 
 [14]
 The only issue before us is whether due process required for parole revocation under Morrissey mandates a timely hearing for a parolee subsequently convicted and confined in another state. Once such a hearing is held, and if the parole is revoked and the revocation state determines that it still wants the prisoner upon his release, the detainer could continue without in anyway violating this opinion. Nonetheless, we cannot avoid commenting that the exact purpose and logic of the continuing detainer escapes us. Removing the prisoner from the opportunity of rehabilitation during the remainder of his sentence because he must ultimately serve out an earlier sentence in another jurisdiction, makes little sense. The action must rest partially on the irrational premise that by the commission and the conviction of another crime he is in less need of vocational rehabilitation then the felon who is serving time for his first offense
 The justification for placing the prisoner under the punitive measures of a detainer rests generally on the idea that because of the prospect of additional time the prisoner is a poor risk for work release or as a trustee. This reasoning militates against the alternative prospect that a prisoner, facing release to another state might be more motivated toward good behavior and rehabilitation if there was the prospect that upon release the first state might reparole him because of his showing of adjustment.
 
 
 [15]
 The National Advisory Commission on Criminal Justice Standards and Goals, Report on Corrections 407 (1973) has noted:
 That taking no action and returning the parolee to the institution are not the only two courses open. The work of the California community treatment programs shows that the availability of alternative measures-- short-term confinement or special restrictions-- can be extremely useful in dealing with parolees instead of causing them a long-term return to an institution. Likewise, the Model Penal Code suggests that jurisdictions develop alternatives to the no action vs. full revocation dilemma. Such alternative modes need to be developed and formalized and used much more extensively.
 
 
 [16]
 Assuming the detainer is removed, there is, of course, nothing in this opinion which would prevent the State of Arkansas from notifying the State of Michigan of Williams' release date