534 F.2d 353
 175 U.S.App.D.C. 151
 William Harvey JONES
v.
Steve D. JOHNSTON, Executive U.S. Board of Parole, Appellant.
Arthur E. BYRD et al., Individually and on behalf of others
similarly situated
v.
Maurice J. SIGLER, Chairman, et al., Appellants,
Delbert C. Jackson, Director Department of Corrections
District of Columbia, et al.
 Nos. 74-1424, 74-1517.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 8, 1975.
Decided March 23, 1976.
Rehearing Denied June 9, 1976.
 
 Steven W. Snarr, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Robert M. Werdig, Jr., and Oscar Altshuler, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellants.
 Robert Plotkin, Washington, D. C. (appointed by this court), with whom Dina Lassow and Richard Hand, Washington, D. C., were on the brief, for appellees.
 Before McGOWAN and ROBINSON, Circuit Judges, and GUS J. SOLOMON,* Senior United States District Judge for the District of Oregon.
 Opinion for the court filed by Circuit Judge McGOWAN.
 McGOWAN, Circuit Judge:
 
 
 1
 These appeals present the question of when a prisoner serving a sentence for a crime committed while on parole, and against whom a parole violator warrant has been issued and lodged as a detainer, is entitled to a revocation hearing and determination upon request. The Government, appealing two District Court decisions,[1] insists that hearing and determination may be deferred until the intervening incarceration has terminated, although it accepts the premise that the Constitution requires that a hearing ultimately be provided. We hold that this position does not measure accurately the reach of the Due Process Clause.
 
 I. BACKGROUND
 A. No. 74-1517
 
 2
 The situations of the three appellees in No. 74-1517 (Fitzgerald, Kelley, and Byrd) are similar in all material respects.
 
 
 3
 Fitzgerald had been convicted of bank robbery in the Middle District of Pennsylvania in 1963, and after serving just over seven years of his ten year sentence received a mandatory "good-time credit" release pursuant to 18 U.S.C. §§ 4163, 4164 (1970).[2] On July 27, 1970, the U.S. Parole Board issued a parole violator warrant against him for failure to report for supervision; when Fitzgerald was arrested in March, 1971 and charged with robbery in the District of Columbia, the violator warrant was lodged against him as a detainer at his place of incarceration.[3] On March 31, the Board updated the warrant to include an allegation of committing an offense while on parole. Fitzgerald pleaded guilty in District Court to robbery, 22 D.C.Code § 2901 (1967), and was sentenced on August 31, 1972 to three to twelve years, to run concurrently with any other sentence "that (he) . . . might be exposed to." 372 F.Supp. at 892.
 
 
 4
 The detainer has remained lodged against him to the present, despite several requests by Fitzgerald that the Board hold a prompt revocation hearing. The Board has conducted a "dispositional review"[4] of his case, and has determined to take no action on the detainer until the intervening robbery sentence has been served and he has been taken into federal custody under the (executed) violator warrant.
 
 
 5
 Appellee Byrd was paroled on June 14, 1971 from a three to twelve year sentence imposed in 1965 for a robbery conviction. In September, 1971, he was arrested and charged with armed robbery, and was incarcerated in the District of Columbia jail where on November 11 a detainer based on the armed robbery charge was lodged against him. He pleaded guilty to armed robbery on July 6, 1972, and was sentenced to four to twenty years, to run concurrently with any other sentence then being served. The detainer has remained lodged against him at Lorton Reformatory. Byrd's caseworker has requested that the Board take action on the detainer; the Board has responded that the detainer will remain on file, and that periodic dispositional reviews will be undertaken by the Board.
 
 
 6
 Kelley had received a twenty-five year sentence in 1963 for armed robbery of a post office, from which he was paroled in 1971. On June 23, 1972, he was sentenced in District of Columbia Superior Court to one to three years for attempted robbery, and a parole violator warrant was lodged against him as a detainer. On August 8, 1972, Kelley also was convicted in District Court of armed robbery, and received a sentence of from three to fifteen years, which he is now serving. As is the case with the other two appellees, the detainer has been allowed to stand against Kelley since his conviction. Kelley's prison caseworker submitted to the Board in August 1973 a letter from Kelley requesting action on his detainer, and the Board has advised him that it will conduct periodic dispositional reviews.
 
 
 7
 On November 7, 1973, Fitzgerald filed the instant action, alleging jurisdiction under 28 U.S.C. §§ 1361, 2241, 2255 (1970), and asking, inter alia, that the action be certified as a class action,[5] that the parole violator warrant outstanding against him be quashed, and that the Board be required to hold speedy revocation hearings on all parole violator warrants placed against persons incarcerated for subsequent convictions.[6]
 
 
 8
 On December 31, 1973, an amended complaint was filed in which Fitzgerald, Byrd and Kelley joined, essentially identical to Fitzgerald's complaint save that jurisdiction was based only on 28 U.S.C. §§ 1361, 2241 (1970). On March 13, 1974, the District Court ruled that (1) petitioners are "in custody" for the purposes of 28 U.S.C. § 2241, (2) the Board was constitutionally required to hold a final revocation hearing within a reasonable time after the detainers had been lodged and the parolees had been incarcerated pursuant to their convictions, and (3) as a consequence of the Board's delay, the detainers and warrants must be quashed. The appeal in No. 74-1517 is taken from these rulings.
 
 B. No. 74-1424
 
 9
 On May 17, 1968, appellee Jones was convicted of housebreaking and grand larceny in the District Court, and was sentenced under the Narcotic Addict Rehabilitation Act (NARA), 18 U.S.C. § 4253 (1970), to an indeterminate term not to exceed ten years. He was released on parole in October of 1969, but five months later the Board of Parole issued a parole violator warrant charging him with failure to comply with the NARA aftercare program, violation of the Harrison Narcotic Act, falsifying a supervision report, and failure to report to his probation officer. That and a supplemental warrant were lodged against Jones at the District of Columbia Jail, where he was being held on a stolen vehicle charge. On January 18, 1971, Jones pleaded guilty to attempted unauthorized use of a motor vehicle, and was sentenced to one year with credit for time served; in September of that year he pleaded guilty to a narcotics offense, and was sentenced to five years imprisonment.
 
 
 10
 In October of 1971 Jones was transferred to Lorton, where the warrants were lodged against him. After a dispositional review in January, 1972, the Board chose to continue the detainer subject to periodic review. Jones filed the instant action six months later,[7] alleging that he had been denied access to certain rehabilitative programs as a result of the detainer, and in particular that he had been denied on-the-job training. Following a March, 1973 dispositional review at which the Board again permitted the detainer to continue in effect, Jones' attorney suggested that the dispute might be settled if the detainer were withdrawn to permit access to rehabilitative programs. The Board acquiesced and withdrew the detainer temporarily to allow Jones to participate in rehabilitative programs, with the understanding that the warrant again would be lodged shortly before the expiration of the intervening sentence. Jones then urged that the warrant be quashed because of the delay in holding a dispositional hearing. On January 9, 1974, the District Court granted Jones' request and ordered that the violator warrant be cancelled for failure to provide a prompt revocation hearing.
 
 II. CUSTODY
 
 11
 Appellants argue that appellees are not "in custody" for the purpose of habeas corpus jurisdiction.[8] This contention, which may have had merit under the "prematurity doctrine" of McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934), has been undercut by later cases. Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968) (habeas will lie to challenge future sentence consecutive to that being served); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) (federal prisoner constitutionally entitled to speedy trial on pending indictment for offense under state law); Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) (state prisoner is "in custody" for purpose of federal habeas corpus challenge to denial of his constitutional right under Smith v. Hooey to speedy trial on pending indictment in another state). We hold that a parole violator warrant lodged as a detainer[9] represents sufficient "custody" of a parolee-prisoner to support habeas corpus jurisdiction under 28 U.S.C. § 2241.[10]
 
 III. THE RIGHT TO A PROMPT HEARING
 
 12
 In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Supreme Court ruled that due process requires a "preliminary" and "final" hearing for revocation of parole or probation. The parties here agree that the need for the preliminary, or "probable cause" hearing is eliminated in these cases by the conviction on the violation charged. The matter in dispute is the timing of the final hearing may it be delayed until the intervening sentence has been served, or is there a due process right to a determination of an outstanding detainer within a reasonable time after conviction on an intervening charge?[11]
 
 
 13
 Questions of procedural due process require a two-step analysis: first, does the deprivation under challenge constitute a denial of liberty or property within the meaning of the due process clause, and second, if so, upon consideration of the private and governmental interests implicated, is the deprivation unconstitutional? E. g., Board of Regents v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548, 556-57 (1972), Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972). As to the first half of this analysis, the Court in Morrissey found that a parolee's interest in not being incarcerated solely on the basis of an executed parole violator warrant was cognizable under the due process clause.
 
 
 14
 The instant appeals do not involve prisoners who would be free but for the actions of the Parole Board. We believe, however, that a parolee-prisoner need not assert an interest in immediate liberty to claim the constitutional guarantee of due process. In Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), prison disciplinary proceedings were found to threaten sufficient deprivation (loss of good time credits) to warrant those due process guarantees which would not impair the internal security interests of the prison.[12] And, in Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), the Court noted strong prisoner interests in accuracy, certainty, and the possibility of earlier release in ruling that an accused retained the Sixth Amendment right to a speedy trial despite incarceration for conviction on another charge:
 
 
 15
 At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.
 
 
 16
 And while it might be argued that a person already in prison would be less likely than others to be affected by "anxiety and concern accompanying public accusation," there is reason to believe that an outstanding untried charge (of which even a convict may, of course, be innocent) can have fully as depressive an effect upon a prisoner as upon a person who is at large. . . . In the opinion of the former Director of the Federal Bureau of Prisons,
 
 
 17
 "(I)t is in their effect upon the prisoner and our attempts to rehabilitate him that detainers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement."
 
 
 18
 Finally, it is self-evident that "the possibilities that long delay will impair the ability of an accused to defend himself" are markedly increased when the accused is incarcerated in another jurisdiction.
 
 
 19
 393 U.S. at 378-79, 89 S.Ct. at 577, 21 L.Ed.2d at 611. Although we recognize that Smith v. Hooey is not a "due process" case, it is our view that a prisoner's interest in a speedy trial while incarcerated on another charge is in many ways similar to the interest in a prompt parole revocation hearing in the instant case. The guarantee of due process is surely not so narrow or inflexible as to exclude from its protection the interests described in more detail at pp. ---- - ---- of --- U.S.App.D.C., at 360 of 534 F.2d infra asserted by appellees.
 
 
 20
 We thus turn to considering whether those interests in a prompt hearing, when judged against the Government's asserted interests in delaying the hearing until the intervening incarceration has ended, require the relief appellees seek. We begin by noting that the Government's argument seems to us overstated in one important respect. We believe it is clear and it may be that the Government would not contend otherwise that due process requires that a revocation hearing be held sufficiently before the end of the intervening incarceration so that, if the decision of the Board is not to revoke parole, unnecessary incarceration is avoided. Otherwise, a prisoner might be taken into custody after his intervening sentence had expired and pending the Parole Board's determination; and, if that determination were not to revoke parole, the prisoner would have been incarcerated for a not insignificant period of time and with absolutely no justification. Incarceration is always a drastic step, and one's interest in avoiding such a deprivation is of "transcending value." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73, 25 L.Ed.2d 368, 375 (1970); Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341-42, 2 L.Ed.2d 1460, 1472 (1958). There is no reason of substance why the Government could not provide a revocation hearing in time to reach a decision before the intervening sentence has expired,[13] and we think it clear that it is required to do so upon request by a parolee-prisoner.[14]
 
 
 21
 Against that background, the narrow legal question raised by the circumstances of these appeals is highlighted: Are prisoners in appellees' situation entitled to a prompt hearing, or may the Government defer the hearing that must eventually be provided until shortly before the expiration of the intervening sentence? To answer this question we must analyze the private and Government interests in the timing of the hearing.
 
 A. The Prisoner's Interests
 
 22
 When, as in these cases, the fact of parole violation has been established by a criminal conviction, the parole revocation hearing does not thereby lose its significance. As the Supreme Court noted in Morrissey v. Brewer, the Parole Board must determine not only whether there has been a violation, but also whether that violation justifies revocation of parole:
 
 
 23
 Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex.
 
 
 24
 408 U.S. at 479-80, 92 S.Ct. at 2599, 33 L.Ed.2d at 493. The Court later indicated, in Gagnon v. Scarpelli, that a parole board should exercise its discretion to appoint counsel for a probation or parole violator who has substantial evidence in mitigation of the violation to present at the revocation hearing:
 
 
 25
 Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present.
 
 
 26
 411 U.S. at 790, 93 S.Ct. at 1764, 36 L.Ed.2d at 666 (emphasis added).[15]
 
 
 27
 Clearly, the final revocation proceeding is a matter of great consequence even to a prisoner whose violation has been established by a criminal conviction.[16] The question then becomes what interests the parolee has in having a decision as to the disposition of his parole revocation proceeding i. e., whether parole will be revoked and, if so, whether revocation will result in imprisonment beyond the expiration of the intervening sentence made promptly rather than at the end of his intervening sentence. We perceive four categories of interest: accuracy in the determination, certainty of future disposition, access to privileges and rehabilitation programs during the intervening sentence, and potential for earlier release.
 
 1. Accuracy in the determination
 
 28
 The parole revocation hearing is a fact-finding process of extremely broad scope.[17] Among the factors that the Board can consider at that hearing, two of the most important from the viewpoint of the parolee-prisoners are mitigating factors attending the violation[18] and personal and social history in the community.[19] The parolee consequently may wish to learn of the Board's information on his behavior and, when appropriate, to challenge that information by presenting his own evidence and witnesses.[20]
 
 
 29
 The Morrissey decision was grounded in part on the need to protect the fairness and integrity of the parole process;[21] and, as we have noted, express recognition was given in Gagnon v. Scarpelli to the importance of evidence in mitigation of an offense.[22] Delaying the hearing for the period involved in the intervening sentence may seriously prejudice a parolee's ability to present accurately his side of the story, whether or not a violation has been established conclusively.[23] To begin with, the passage of time can make it more difficult for the parolee-prisoner to obtain evidence and testimony bearing on both mitigating factors and reputation in the community. And even assuming that the necessary witnesses can eventually be located, there is the inescapable prejudice that accompanies impaired recollection. Since the prejudice that may be caused by delay will often be difficult to demonstrate at the time of the delayed hearing, we think the interest of the parolee-prisoner in a prompt hearing is entitled to considerable weight.
 
 
 30
 The Board suggests that its disposition will be more accurate if it is able to consider the parolee's conduct in the prison during his intervening confinement. It is our understanding that the Board retains this power in any event, for it may reconsider at any time a decision to revoke parole and, specifically, may alter its planned disposition because of interim prison behavior.[24]
 
 
 31
 In addition to the evidentiary interests discussed above, the parolee validly may conclude that he has an interest in establishing the Board's opinion of his conduct and potential at the start of the intervening confinement, so that any later change in the disposition must be justified specifically by the institutional conduct.
 
 2. Certainty of future disposition
 
 32
 The parolee also has a definite, personal interest in being relieved of uncertainty as to what his future will be. As noted above, the Supreme Court recognized in Smith v. Hooey[25] that the anxiety and depression resulting from a detainer based on a pending criminal indictment may have a severely corrosive effect on rehabilitation.[26] We have no reason to believe that the effects are any the less significant when the detainer is lodged because of a parole violation.[27] That the appellees have not challenged the Board's power to withhold the execution of a revocation decision until the completion of the intervening sentence, and to alter an adverse parole revocation decision on the basis of interim prison behavior, does not gainsay the increased certainty that results from a hearing and decision on the pending detainer.
 
 
 33
 In the first place, we note that the asserted power of the Board to withhold execution of a revocation decision has no effect on the certainty interest of parolee-prisoners as to whom the Board has made a final decision to withdraw the warrant. In those cases, only subsequent prison conduct constituting a parole violation would justify a later decision by the Board to revoke parole. Moreover, as to those parolee-prisoners who have received an adverse parole revocation decision, we note that consecutive sentences and the ability of the Parole Board to overturn a prior, adverse decision are aspects of prison life we have neither the desire nor the ability to affect. A prompt revocation hearing thus nevertheless serves an important "certainty" interest of the prisoner.
 
 3. Access to rehabilitative programs
 
 34
 A detainer lodged against a prisoner may have a particularly damaging effect if it results in denial of access to educational or rehabilitative programs. This issue has been mooted to some extent in the instant case by stipulation of the parties after the District of Columbia Department of Corrections issued new guidelines for the "inmate custody classification" which determines access to various programs.[28] A detainer no longer will bar admission to rehabilitative programs automatically; it will be only one of a large number of factors considered in the classification decision.
 
 
 35
 We note, however, that even under the new policy a prisoner may have a substantial interest in the removal of a detainer lodged against him. The detainer will continue to be a consideration, and the inmate may never know whether his custody classification might have been changed had there been no detainer.[29] The potential for prejudice thus created may be of great concern to the prisoner, and creates a substantial interest in a reasonably prompt revocation hearing.[30]
 
 4. Opportunity for earlier release
 
 36
 Finally, a prompt hearing and decision would give the parolee-prisoner an opportunity to obtain earlier release from prison. The Board argues that, given its power to delay execution of the warrant following a revocation decision, any benefits of an early decision in the concurrent sentence situation are illusory. There are two answers to this contention.[31]
 
 
 37
 First, the fact that the judge who imposes the intervening sentence cannot impose on the Board a requirement that the intervening sentence run concurrently with the original sentence[32] does not mean that the judge is powerless to enforce his intent as to the total sentence to be served. If the Board announces its decision to revoke parole, but to force the original and intervening sentences to run consecutively by delaying execution of the warrant, the parolee then could return to the sentencing judge to request a reduction in sentence to approximate the original intended result.[33] Insofar as the Board may seek to deny effect to the sentencing judge's intent that the sentences run concurrently, the parolee has a very great interest in obtaining a revocation decision so that he can return to the court and request a modification of his sentence.
 
 
 38
 Second, a parolee validly may conclude that an outstanding detainer will lessen his chances of securing parole from the intervening sentence. See Gay v. United States Board of Parole, 394 F.Supp. 1374, 1377 (E.D.Va.1975) ("The presence of a federal detainer 'unquestionably' affects a state prisoner's eligibility for parole."); United States ex rel. Hahn v. Revis, 520 F.2d 632, 637 (7th Cir. 1975) (mandate withdrawn); Cooper v. Lockhart, 489 F.2d 308, 314 n.10 (8th Cir. 1973). A decision not to revoke would remove the detainer and thereby aid his efforts to be released from the intervening sentence; a decision to revoke, and to impose consecutive sentences, may influence the intervening custodian to consider a plea for earlier release.
 
 
 39
 As we have noted several times, an early adverse decision will not result in a fixed future course; the Board remains able to change its determination based on information later received. It is clear, however, that the possibility of a future change in disposition is but a factor affecting the weight of the interests in certainty and earlier release, and by no means eliminates them. In Wolff v. McDonnell, discussed above, the Supreme Court granted to prisoners facing loss of good time credits in disciplinary hearings those due process rights which were compatible with the serious internal security and administrative interests of the prison officials. The Court expressly held that, although the deprivation of good time credits has uncertain future effect,[34] still it is a deprivation which must be preceded by whatever elements of a fair hearing are practicable in the situation. 418 U.S. at 560-61, 94 S.Ct. at 2976-77, 41 L.Ed.2d at 953-54.
 
 
 40
 Although the interest in earlier release is concededly substantial, the Board repeatedly has expressed its belief that, in general, a parolee will obtain a better disposition if he receives the delayed hearing. We cannot accept the Board's assertion that a parolee's desire to have a prompt hearing should be submerged in reliance on the benevolent intent of the parole officers. As the Supreme Court noted in Gagnon v. Scarpelli, supra :
 
 
 41
 (A)n exclusive focus on the benevolent attitudes of those who administer the probation/parole system when it is working successfully obscures the modification in attitude which is likely to take place once the officer has decided to recommend revocation. Even though the officer is not by this recommendation converted into a prosecutor committed to convict, his role as counsellor to the probationer or parolee is then surely compromised.
 
 
 42
 411 U.S. at 785, 93 S.Ct. at 1761, 36 L.Ed.2d at 663.
 
 B. The Board's Interests
 
 43
 The Parole Board primarily has argued in these cases that a prisoner-parolee does not have a substantial interest in a prompt revocation hearing, rather than asserting an affirmative interest in delay. The Board has, however, emphasized its "punishment" interest in delaying execution of a warrant to lengthen total imprisonment, an "administrative" interest in avoiding travel to distant places of incarceration and duplicative hearings, and an "oversight" interest in consideration of prison conduct during the intervening sentence.
 
 
 44
 Appellees have not challenged the ability of the Board to delay the implementation of a revocation decision so as to have the intervening and (the unserved portion of) the original sentence run consecutively. Their asserted interest is in the prompt decision alone; the Board's "punishment" interest in delaying execution therefore is not material.[35] As a result, we must consider the Board's "administrative" and "oversight" interests in delay.
 
 1. Administrative Interests
 
 45
 The Board might assert two administrative interests in delaying revocation hearings until the completion of intervening sentences: (1) the difficulty and expense of conducting hearings in distant state prisons where parole violators may be incarcerated on their intervening sentences;[36] and (2) the cost of additional hearings when the Board decides to re-evaluate a decision made at the commencement of an intervening sentence on the basis of prison behavior.
 
 
 46
 The transportation problem is not unique to the parolee imprisoned for a new sentence. The Supreme Court in Morrissey v. Brewer also faced the problem of parolees under supervision in a distant state, yet due process was held to require a preliminary hearing "reasonably near the place of the alleged parole violation" before removal to the original place of imprisonment for a final revocation hearing. 408 U.S. at 485, 92 S.Ct. at 2602, 33 L.Ed.2d at 496. The Court had occasion in Gagnon v. Scarpelli to respond to assertions of practical difficulties caused by the Morrissey decision:
 
 
 47
 Petitioner argues, in addition, that the Morrissey hearing requirements impose serious practical problems in cases such as the present one in which a probationer or parolee is allowed to leave the convicting State for supervision in another State. Such arrangements are made pursuant to an interstate compact adopted by all of the States . . . .
 
 
 48
 Some amount of disruption inevitably attends any new constitutional ruling. We are confident, however, that modification of the interstate compact can remove without undue strain the more serious technical hurdles to compliance with Morrissey. An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. Petitioner's greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in Morrissey intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the Morrissey requirements.
 
 
 49
 411 U.S. at 782 n.5, 93 S.Ct. at 1760, 36 L.Ed.2d at 662. Given the procedural flexibility of the hearing required by Morrissey, we are unpersuaded that the transportation interest is a substantial objection to a requirement of prompt revocation hearings.[37] In fact, the Board's own regulations reflect the need for a certain degree of procedural flexibility despite the additional expense; as we noted earlier, the regulations authorize holding a revocation hearing reasonably near the place of an alleged violation if the "local" hearing would facilitate production of witnesses or retention of counsel and if the parolee denies that any violation was committed. 28 C.F.R. § 2.55(a); see note 20 supra.
 
 
 50
 Present practice is for the Board to hold annual dispositional reviews of outstanding unexecuted warrants lodged as detainers.[38] It therefore would not appear to be a substantial additional burden to require a prompt revocation hearing, nor does it appear that an end-of-sentence "re-evaluation" hearing would require greater expense than the current system. Indeed, we note that the expense of such a "re-evaluation" hearing applies only to those parolee-prisoners who have received adverse revocation decisions. Moreover, the Government is spared the expense of dispositional reviews for those parolee-prisoners who have received favorable parole revocation decisions.
 
 
 51
 Perhaps most to the point, however, is the fact that the transportation burden would have to be assumed in any event. For, as we noted above, it seems plain that a hearing has to be held sufficiently before the expiration of the intervening sentence to eliminate the risk of unjustified incarceration. See pp. ---- - ---- of --- U.S.App.D.C., 359 of 534 F.2d supra. The question is merely one of the timing of a hearing that must to some degree precede the expiration of that sentence, and the Board has no interest whatsoever in postponing the burden of transportation whose assumption is ultimately inevitable.[39]
 
 2. The Oversight Interest
 
 52
 Appellants argue that the Parole Board should have discretion to delay the final hearing to enable it to "consider the record of the parolee's interim institutional performance in determining whether to revoke the parole at the end of the intervening sentence or to continue or modify the parole status." (Appellants' Br. at 28). In essence, the Board seeks to condense two determinations into one. The first determination is whether, on the basis of the facts underlying the violator warrant, parole should be revoked; the second is whether events during the intervening incarceration warrant a different disposition. Many parolees may wish that the Board make this combined decision, believing that they may avoid revocation through good behavior in prison. We do not, however, deny them the ability to leave that course open to the Board. We hold only that when a parolee requests a prompt hearing and decision, he is entitled to one.
 
 
 53
 We have noted that a parolee may have a substantial interest in focusing the revocation hearing on the conduct surrounding the violator warrant. When the violation is relatively minor, and he has exceptional references from his community, he may fear that delay in presenting the references will prejudice his case. If the parolee believes that incorrect adverse information has been lodged with the Board, he may conclude that a delay will prejudice his ability to challenge the information or to confront witnesses. Or, when the parolee has a strong case to avoid revocation, he may decide to try for an immediate decision in his favor so as to reduce the risk that prison behavior will prejudice his case.
 
 
 54
 We repeat that an early decision adverse to the parolee-prisoner will not prevent the Board from later reconsideration in light of the record of the parolee-prisoner's interim institutional performance. If, however, the prisoner's interests are served by an early decision and whatever inertial force it carries, the reason for the Board's desire to avoid any decision prior to completion of the intervening sentence escapes us.
 
 C. Conclusion
 
 55
 The result in this case is not strictly mandated by Morrissey, for missing from it is the interest of the parolee in avoiding unjustified incarceration, an interest the importance of which we have already stressed. Yet although the prisoner interests are of a different nature in this case, we believe that they are of substantial importance. They involve the fairness of procedures afforded individuals within the criminal process fairness reflected in both the importance of presenting a full and accurate evidentiary record to the Parole Board and the symbolic importance of not unfairly leaving a prisoner uncertain about when he may expect to return to society. They involve the prisoner's interest in not having the denial of participation in rehabilitative programs or the debilitating effects of uncertainty about his future deprive him of the opportunity to rehabilitate himself in preparation for an orderly adjustment to the world outside. And while provision of a prompt hearing in these ways aids the prisoner, it also serves society by preserving the integrity of the criminal process and furthering the community goal of rehabilitation that, along with other objectives, is the very basis for invocation of the criminal sanction.
 
 
 56
 As or more important is the fact that the Parole Board has presented no reason of any force whatsoever to justify delaying a hearing that the parolee has requested. For the question presented is not as in Morrissey whether due process requires a hearing not otherwise provided, but when a required hearing must be held. If there were Government arguments of substance as to why delay was necessary,[40] we would find this to be a harder case. But the asserted justifications for delay are so groundless as to make it clear that the due process clause requires a prompt hearing upon request.[41]
 
 
 57
 The absence of a Government interest of any significance in delaying the hearing until the expiration of the intervening sentence also answers the possible suggestion that parolees should have to present some specific allegation or proof that delaying a hearing will cause prejudice before a hearing is required. Concededly, in some cases a parolee might be able to allege specifically that because of the detainer's being lodged, he is likely to be denied participation in rehabilitation programs, or the opportunity for early parole, in respect of his intervening sentence. And in some cases he may be able to gather the information necessary to make a showing that he will be prejudiced in presenting evidence of mitigating circumstances or good reputation that might influence the Board not to exercise its power to revoke parole. But in other cases the prisoner may have difficulty while under incarceration, and without any legal assistance, in comprehending the relevant issues and making out the kind of showing that would be prepared by a party who is at liberty and represented by counsel. Simply stated, this requirement may be unrealistic when considered against the circumstances of the prisoner. Moreover, it is not the case that a parolee will automatically have his parole revoked, after an intervening conviction, unless he can affirmatively establish some extenuating circumstances; rather, after the parolee presents evidence that he thinks will aid his case, the Board possesses broad discretion in deciding whether to revoke parole.
 
 
 58
 There are, furthermore, certain kinds of prejudice to prisoner interests that exist across the board and thus do not require case-by-case documentation. In every case the prisoner's interest in avoiding uncertainty will be implicated. In every case the prisoner might wish to be able to petition the sentencing judge on the intervening sentence, present to him the decision of the Board, and ask him to modify the sentence he imposed in light of the Board's action. And in every case, there is a substantial possibility that delay will impair presentation of a full and accurate record to the Board, prejudice that may escape attempts at anticipation, discovery, and demonstration. These interests alone seem to us far more weighty than the chimerical interests asserted by the Government.
 
 
 59
 Finally, we note that a rule requiring demonstration of prejudice could result in undercutting the Board's interests by adding another layer to the hearing procedure. The Board would be required to give careful consideration to petitions alleging that the circumstances presented by each parolee-prisoner claiming a right to a hearing. Pro se petitions are often inartfully drawn, and fair and thorough consideration of whether particular prisoners should be granted a hearing would require considerable effort. Denials of requests for hearing would be subject to judicial review, and anyone familiar with the flood of habeas corpus petitions that are filed by prisoners will have little difficulty predicting that the Government would find itself having to defend against an enormous number of actions brought in District Court seeking to overturn the Board's denial of a hearing. If the District Court reverses, the hearing will have to be held in any event; if it affirms, still more proceedings may lie in the appellate court; and if the Government finally prevails, all of the effort required to do so will merely delay, not eliminate, the holding of a hearing. Thus, the suggestion that prejudice must be shown is not only both unrealistic and inconsistent with a careful consideration of the relevant private and Governmental interests, it is also likely to end up imposing at least as great a burden on the Government as the requirement of a hearing upon request.
 
 IV. DECISIONS IN OTHER CIRCUITS
 
 60
 The issue addressed in this appeal has been considered by eight other courts of appeals. Six circuits have held that Morrissey does not require the Parole Board to provide a revocation hearing to a parolee convicted and incarcerated on an intervening charge prior to completion of the intervening sentence.
 
 
 61
 In Small v. Britton, 500 F.2d 299 (10th Cir. 1974), the Tenth Circuit reaffirmed its holding in Simon v. Moseley, 452 F.2d 306 (1971) that "while a revocation warrant must be executed within a reasonable time . . . incarceration in a state institution (is) . . . a good reason for delay in the execution of a warrant." The court agreed with the Fifth Circuit that a parolee is not taken into custody until after a parole revocation warrant has been executed, and held that Morrissey rights are triggered only by execution of the detainer, rather than by its issuance:
 
 
 62
 As to (the final) . . . hearing the Court merely stated that it be afforded "within a reasonable time after the parolee is taken into custody." (Emphasis added). Morrissey, supra (408 U.S.) at 488, 92 S.Ct. at 2604.
 
 
 63
 A federal parolee is not taken into custody until after the parole revocation warrant has been executed. Accord, Cook v. United States Attorney General, 488 F.2d 667 (5th Cir. 1974). 18 U.S.C.A. § 4207 provides that a parolee is entitled to a hearing only after he is "retaken upon a warrant." (Emphasis added). . . .
 
 
 64
 In summary, we conclude: (1) the Morrissey decision requires that a revocation hearing be held within a reasonable time after the parolee is taken into custody; (2) a parolee is not "taken into custody" until the revocation warrant has been executed; (3) Morrissey does not require that a revocation warrant be executed immediately after it has been issued; and (4) incarceration in a state institution is a good reason for delay in the execution of a warrant.
 
 
 65
 500 F.2d at 301-02.[42] We do not believe that the Court in Morrissey meant by the words "taken into custody"[43] to condition prisoners' due process rights on the technical requirement that a warrant be executed, when an unexecuted warrant may have a substantial impact on the prisoner against whom it is lodged. The Supreme Court did not consider the circumstance of a prisoner who already is in custody on another charge, and, while we agree that our result is not commanded by the language of the Morrissey decision, we also believe that it is the duty of this court to uphold a claim of right when it is supported by the balancing of interests approved in that decision.
 
 
 66
 In Cook v. United States Attorney General, 488 F.2d 667 (5th Cir. 1974), cert. denied, 419 U.S. 846, 95 S.Ct. 81, 42 L.Ed.2d 75 (1974), the Fifth Circuit based its decision that the Parole Board could wait until an intervening sentence was completed before holding a parole revocation hearing on the conclusion summarized above, namely, that "execution of the warrant is the operative factor in triggering the availability of the revocation hearing." Id. at 671. The court recognized that a detainer may cause anxiety, problems in rehabilitation, and denial of educational opportunities, but noted that the prisoner had not demonstrated actual prejudice from the six-year delay prior to his revocation hearing, and chose to defer to the administrative expertise of the Parole Board.[44]
 
 
 67
 We cannot concur with either the Fifth Circuit's conclusion as to the balancing of interests or as to the degree of deference which must be shown actions of a parole board. The Board has presented no substantial interests to justify the delay of revocation hearings until the completion of intervening sentences, and when the issue is presented in that posture we cannot deny relief on a general claim of "agency expertise." In Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 240 (1963), cert. denied sub nom. Jamison v. Chappell, 375 U.S. 957, 84 S.Ct. 447, 11 L.Ed.2d 316 (1963), this court stated a principle we affirm without hesitation, that "the exercise of discretion in determining whether or not parole should be revoked . . . represents a very high form of expert regulatory and administrative judgment and the expert appraisal of the Parole Board in this area can be regarded as almost unreviewable." Our unwillingness to intrude into the Board's decision on the disposition of a parole violation, cited with approval by the court in Cook,[45] did not constrain the Hyser court from reviewing the procedures used by the Board in conducting preliminary interviews, or from establishing requirements therefor. So in the instant case, where it appears that a procedure regularly employed by the Board results in substantial harm to parolees for no countervailing purpose, we cannot countenance the continuance of the practice on an unelaborated claim of "administrative expertise."
 
 
 68
 The Fourth Circuit joined the Fifth and Tenth in Gaddy v. Michael, 519 F.2d 669 (1975), petition for cert. filed, (Aug. 5, 1975) (No. 75-5215) also upholding the rule that when a warrant has been properly issued within the maximum term of the original sentence, the execution of the warrant may be held in abeyance during the service of an intervening sentence. We read the Fourth Circuit's decision, however, to be sufficiently flexible so as not to preclude agreement with our result in the proper fact situation.
 
 
 69
 In Gaddy, the court of appeals rejected a strict rule that the Parole Board must hold and dispose of a revocation hearing within two months of the issuance of a parole violator warrant. Gaddy never objected to the delay in executing his warrant, id. at 678, and the court refused to grant relief on delay alone,[46] reasoning that he "could not 'sleep on his administrative remedies for fear that he has no case and then claim prejudice by reason of the passage of time.' " Id.
 
 
 70
 The most recent of this group of cases is the Ninth Circuit's decision in Reese v. United States Board of Parole, No. 74-2418, 530 F.2d 231 (1976). Reese affirmed the denial of relief to two prisoners who had been denied parole revocation hearings during intervening sentences, and who petitioned that the warrants be quashed for unreasonable delay. The court noted that neither Morrissey nor the pertinent statute (18 U.S.C. § 4207) expressly requires a prompt hearing in the intervening sentence situation, then argued that the prisoners did not have a substantial due process interest in prompt hearings.
 
 
 71
 The Reese court discussed prisoner interests in prejudice from loss of evidence and from the inability to present mitigating factors, and rejected them as insubstantial. As to the first, it was argued that when a parolee is convicted of a crime committed on parole, "(t)he parole officer is then fairly entitled to assume that all evidence upon which the parolee was legally entitled to rely was presented and considered." at p. 234. This, as we have noted above, simply is not the case. The Parole Board considers a very broad range of evidence in the parole revocation decision, much of which would be irrelevant or inadmissible at a criminal trial the parolee is "legally entitled to rely" on evidence which has no bearing on the conviction itself but which supports his argument that parole should not be revoked despite his conviction. The prisoner's interest in presenting mitigating evidence was brushed aside with the comment that "there are few, if any, suffering penal confinement who do not find such circumstances to explain their own plight," and with the notation that the prisoners' petitions had not identified mitigating evidence they intended to present. The Ninth Circuit's repudiation of the parolee's interest in presenting mitigating evidence disregards both (1) the recognized distinction between the Board's determination that a violation has occurred and its determination whether to revoke parole and (2) the Supreme Court's clear statement in Gagnon v. Scarpelli that even when a parole or probation violation is undisputed, the violator may have a sufficient case in mitigation of the violation to deserve appointment of counsel at a revocation hearing.[47]
 
 
 72
 The parolee's interests in certainty, access to rehabilitation programs, and the possibility of earlier release were not considered by the Reese majority. Judge Duniway, writing in dissent, emphasized the importance of these omitted factors:
 
 
 73
 A detainer can be, and usually is, detrimental to the prisoner. It is, or can be, held against him by the prison authorities and the parole authorities of the jurisdiction where he is imprisoned. It may result in loss of valuable privilege, and in having to serve his full terms in prison when he would otherwise have been released. . . . Moreover, the United States Board of Parole has discretion as to whether to revoke parole at all for a violation and also as to the terms it will impose if it does revoke parole. Not every parole violation, even one based on conviction of an offense while on parole, results in parole revocation. . . . If a prompt hearing is held, the detainer may be lifted. Alternatively, the board may decide to "execute" the warrant, so that the parolee can serve his reinstated time concurrently with the time that he is serving under the new conviction.
 
 
 74
 At p. 237. The majority did not base its decision on countervailing interests of the Parole Board; it did no more than assert that the parolee's interests were unimportant and better left to the "coordinated plan of the United States Board of Parole." Id. at 236.
 
 
 75
 The Third and Sixth Circuits have affirmed by order district court opinions which denied a right to a prompt revocation hearing. In Colangelo v. United States Board of Parole, No. 75-1249, 517 F.2d 1404 (6th Cir. 1975), aff'g Civ. No. C 74-251 (N.D.Ohio Dec. 11, 1974), the District Court had held that Morrissey did not require a revocation hearing prior to completion of an intervening sentence, relying in part on Cook v. United States Attorney General, supra. In Orr v. Saxbe, No. 75-1042, 517 F.2d 1399 (3d Cir. 1975), petition for cert. filed (Oct. 10, 1975) (No. 75-5594), aff'g Civ. No. 74-341 (M.D.Pa. Nov. 27, 1974), the Third Circuit affirmed a conclusion that the presence of a federal parole violator warrant had not caused such a "grievous loss" to the parolee when lodged against him at a Massachusetts state prison as to require a revocation hearing prior to completion of his Massachusetts sentence.
 
 
 76
 The Seventh and Eighth Circuits have reached conclusions substantially similar to our own. In United States ex rel. Hahn v. Revis, 520 F.2d 632 (7th Cir. 1975) (mandate withdrawn),[48] the parolee repeatedly had requested that the Parole Board hold a revocation hearing during his intervening sentence, noting that both federal and state judges had recommended that his sentences be served concurrently. The court adopted the Eighth Circuit's conclusion that the effects of a detainer were sufficient to constitute "grievous loss," citing the following grounds:
 
 
 77
 We recognize that a detainer may result in a loss of privileges while a prisoner is serving a sentence, and that it may substantially diminish the prisoner's prospects for parole. . . .
 
 
 78
 Other elements of grievous loss, resulting from the outstanding detainer and the delay in the opportunity to remove it, include impairment of rehabilitation, possible prejudice in opportunity to defend against charge of violation or to demonstrate mitigating circumstances, and risk of a longer total period of imprisonment.
 
 
 79
 Id. at 637. The Hahn court found a strong showing of prejudice in that the parolee had been denied the opportunity to persuade the Parole Board to execute his warrant and to allow the sentences to run concurrently. Even though it was expressly recognized that the Parole Board, after deciding to revoke parole, retained the discretion to delay execution of the warrant until the completion of the intervening sentence (thereby denying concurrent running of the sentences), the Seventh Circuit concluded that due process required that the parolee be given a timely opportunity to attempt to influence the Board:
 
 
 80
 Obviously there is no point in relitigating the fact that a violation occurred. Yet it is not a foregone conclusion that parole will be revoked. . . . This is true even when the violation involves serious criminal conduct. . . . Accordingly, notwithstanding incarceration for another offense, the violator has a substantial interest in presenting facts in mitigation of the violation that would influence the Board either to set aside the violation warrant or execute it giving him the benefit of concurrent sentences.
 
 
 81
 In 1973 the Eighth Circuit held that the punitive effects of a detainer lodged against a prisoner because of a pending parole revocation proceeding in another state violate a parolee's due process rights if the latter state refuses to determine the question of revocation until the prisoner completes his intervening sentence. Cooper v. Lockhart, 489 F.2d 308. In the more recent case of Cleveland v. Ciccone, 517 F.2d 1082 (1975), the court went beyond Cooper to hold that "federal prisoners are entitled to reasonably prompt hearings on federal parole or release violation warrants and . . . the heretofore frequent practice of deferring such hearings until the expiration of an inmate's intervening sentence violates due process of law." Id. at 1083. It was noted that the Fifth and Tenth Circuits had held that no statutory right to a hearing arises until after execution of the warrant has occurred, but the court held that the due process requirements of Morrissey and Wolff required independent consideration of the interests involved:
 
 
 82
 The possibility that parole may not be revoked after the hearing, or that, if parole is revoked, the original term may be served concurrently with the intervening sentence, the impact of a delayed hearing upon the prisoner's rehabilitation, as well (as?) the potential loss of evidence that may occur during a long delay, are all important interests now firmly recognized in the balancing process which due process entails.
 
 
 83
 Id. The court found further support for its rejection of the "technical distinction" made by the Fifth and Tenth Circuits in the Supreme Court's holding in Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965) (on facts otherwise inapplicable to the present case), that "(a) fundamental requirement of due process is "the opportunity to be heard." . . . It is an opportunity which must be granted at a meaningful time and in a meaningful manner."
 
 
 84
 We concur with the conclusion of the Seventh and Eighth Circuits that a parolee-prisoner is denied his due process right to a hearing "at a meaningful time and in a meaningful manner" if, over his objection, the hearing is not held until the completion of his intervening sentence.
 
 V. REMEDIES
 
 85
 The delay attendant upon the failure to provide the hearings requested in these cases raises the question whether it was either necessary or appropriate to quash the parole violator warrants by reference to the fact of delay alone, as did the District Court. This court has already indicated that in answering that question "actual prejudice vel non (should be) the focal point of the inquiry." Shelton v. United States Board of Parole, supra, 388 F.2d at 574. We specifically noted in Shelton that "delay will not in and of itself suffice to show prejudice, except in an extreme case. Id. See Cleveland v. Ciccone, supra, 517 F.2d at 1089 ("Absent a showing of demonstrated prejudice severe enough to render the revocation hearing itself inadequate in terms of relief, we cannot say that the warrants should have been quashed or other habeas relief granted to preclude revocation of the paroles involved in this case.").
 
 
 86
 We therefore vacate the judgments quashing the warrants and remand the cases to the District Court to provide appellants with an opportunity to show that they have suffered actual prejudice in their attempts to adduce mitigating evidence and testimony and that they are thus entitled to have their parole violator warrants quashed.[49]
 
 
 87
 If the District Court determines that an appellant has failed to prove actual prejudice, the case should be returned to the Parole Board with directions to hold a hearing[50] within a reasonable time.[51] See Gagnon v. Scarpelli, supra, 411 U.S. at 791, 93 S.Ct. at 1764, 36 L.Ed.2d at 666-67; Morrissey v. Brewer, supra, 408 U.S. at 490, 92 S.Ct. at 2604-05, 33 L.Ed.2d at 499-500. In that respect, we adhere to our ruling in Shelton, supra, that the Board too, in deciding whether to revoke parole, must "take into consideration the unavailability of mitigating evidence and testimony occasioned by its delay in holding the revocation hearing and a proffer as to what evidence or testimony appellant would have adduced but for the delay." 388 F.2d at 574.
 
 
 88
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.Code Section 294(d)
 
 
 [1]
 Jones v. Johnston, 368 F.Supp. 571 (D.D.C.1974); Fitzgerald v. Sigler, 372 F.Supp. 889 (D.D.C.1974). The same conclusion was reached in Sutherland v. District of Columbia Board of Parole, 366 F.Supp. 270 (D.D.C.1973)
 
 
 [2]
 18 U.S.C. § 4163 (1970) provides in pertinent part that "a prisoner shall be released at the expiration of his term of sentence less the time deducted for good conduct." A prisoner whose release is mandated by § 4163 prior to the expiration of the maximum term for which he was sentenced is deemed a parolee by § 4164: "A prisoner having served his term or terms less good-time deductions shall, upon release, be deemed as if released on parole until the expiration of the maximum term or terms for which he was sentenced less one hundred and eighty days."
 
 
 [3]
 The purpose of a detainer is to inform the institution that the Parole Board intends to take the prisoner into custody as a parole violator at the completion of his sentence. See note 9 infra
 
 
 [4]
 An affidavit of Maurice H. Sigler, Chairman, United States Board of Parole, describes the "dispositional review" as follows:
 When the Board requests that a parole or mandatory release violator warrant be placed as a detainer against an alleged parole or mandatory release violator in custody as a result of a new criminal offense, the Board periodically conducts dispositional reviews of the warrant to determine whether the detainer should be allowed to remain in effect or whether the warrant should be withdrawn or executed. The initial dispositional review of a case is instituted by a request of the prisoner or on the Board's own initiative. It is presently the practice of the Board to conduct subsequent dispositional reviews of each case on an annual basis. If the warrant is executed, the Board will take action to conduct a prompt revocation hearing. In the dispositional review, which is based on the written record only, the Board specifically analyzes the factors enumerated in the attached Parole Form H-3(a), Summary by Case Analyst-Dispositional Review, in light of the prisoner's record as a whole.
 J.A. 40-41.
 
 
 [5]
 The District Court denied class action status, and appellees have not disputed this ruling
 
 
 [6]
 The complaint also contained an action against the Director of the District of Columbia Department of Corrections and the Warden at Lorton, asking invalidation of Policy 5000 of the Department, which denied certain rehabilitation opportunities to prisoners solely on the ground that a detainer was outstanding against them. During the pendency of the suit, the Department of Corrections adopted Policy 4090, which made a detainer only one of several criteria used in determining eligibility for rehabilitation opportunities. The parties thereupon entered into a stipulation that "(the petitioners) will not be denied a custody classification change solely because of the existence of outstanding detainers," and the judge found the Policy 5000 question to be moot. Appellees do not challenge this finding on appeal
 
 
 [7]
 The action was filed June 16, 1972, but was dismissed on res judicata grounds. This court reversed the dismissal on April 30, 1973, and directed that the case be heard on the merits
 
 
 [8]
 28 U.S.C. § 2241(c)(3) (1970): "The writ of habeas corpus shall not extend to a prisoner unless . . . (3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . ."
 
 
 [9]
 The Board argues that Jones' case is different from that of the other three appellees since the detainer lodged against him has been withdrawn and therefore he cannot be said to be in custody for the purposes of § 2241. In Braden, supra, at 489 n.4, 93 S.Ct. at 1126-27, 35 L.Ed.2d at 449, the Supreme Court reserved the question whether a detainer must be filed for a prisoner to be "in custody" under an indictment issued by another state. We are not faced, however with a case in which no detainer ever was filed, and we do not address that situation. We believe that where, as here, the future custodian has actually lodged a detainer against a prisoner, thereby evidencing its intent to retake him at the end of his intervening confinement, the state of custody is not ended by a later temporary withdrawal of the detainer. Hence, Jones too is "in custody" for purposes of § 2241
 
 
 [10]
 We note that the question whether a parolee-prisoner is "in custody" when a parole violator warrant has been lodged against him as a detainer has been answered in the affirmative, either expressly or by implication, by all of the circuits presented with the situation. Gaddy v. Michael, 519 F.2d 669 (4th Cir. 1975), petition for cert. filed, (Aug. 5, 1975) (No. 75-5215); Cook v. United States Attorney General, 488 F.2d 667 (5th Cir. 1974), cert. denied, 419 U.S. 846, 95 S.Ct. 81, 42 L.Ed.2d 75 (1974); United States ex rel. Hahn v. Revis, 520 F.2d 632 (7th Cir. 1975) (mandate withdrawn); Cleveland v. Ciccone, 517 F.2d 1082 (8th Cir. 1975); Reese v. United States Board of Parole, No. 74-2418, 530 F.2d 231 (9th Cir. 1976); Small v. Britton, 500 F.2d 299 (10th Cir. 1974). See also Orr v. Saxbe, No. 75-1042, 517 F.2d 1399 (3d Cir. 1975), petition for cert. filed (Oct. 10, 1975) (No. 75-5594), aff'g Civ. No. 74-341 (M.D.Pa. Nov. 27, 1974); Colangelo v. United States Board of Parole, No. 75-1249, 517 F.2d 1404 (6th Cir. 1975), aff'g Civ. No. C 74-251 (N.D.Ohio Dec. 11, 1974)
 
 
 [11]
 Our discussion is narrowed by three considerations. First, the parties concur that the Board may delay the revocation hearing until after completion of a trial for the conduct charged in the violator warrant. See generally Shelton v. United States Board of Parole, 128 U.S.App.D.C. 311, 388 F.2d 567, 572 (1967). Second, it is agreed that the right to a prompt hearing may be waived, and that the Board therefore is required only to provide a prompt hearing upon a proper request; if no request is made, the timing of the hearing is wholly within the Board's discretion. Finally, appellees ask only that the Board be required to hold a hearing and announce a decision. They do not challenge, and we do not rule on, the Board's right to postpone the effect of that decision until after the parolee-prisoner has served the intervening sentence. As noted below, pp. ---- - ---- of --- U.S.App.D.C., at 364 of 534 F.2d & n.31 infra, this last agreement does not foreclose inquiry into the problem of concurrent vs. consecutive sentences ; the parolee may believe that a prompt hearing will improve his chances of convincing the Parole Board to let the sentences run concurrently
 
 
 [12]
 That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. . . . They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life
 It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount.
 418 U.S. at 561-62, 94 S.Ct. at 2977, 41 L.Ed.2d at 954.
 
 
 [13]
 As is discussed more fully below, the Board has only two interests in delaying the provision of a parole revocation hearing. The first, the "administrative interest," has two parts: (A) the burden of holding hearings in distant state prisons where parole violators may be incarcerated on their intervening sentences, and (B) the cost of additional hearings when the Board decides to reevaluate a decision based on prison behavior during the intervening sentence. The second interest the "oversight interest" is in ensuring the ability to consider the parolees' interim institutional performance in deciding whether to revoke parole at the end of the intervening sentence. It should be clear that both the second interest and Part B of the first interest are virtually non-existent when the hearing is to be moved forward only far enough to ensure its completion before the expiration of the intervening sentence. As for part A of the first interest, we do not believe it substantial, for reasons stated at pp. ---- - ---- of --- U.S.App.D.C., at 366 of 534 F.2d infra ; and we further note that in cases where the decision after hearing is not to revoke parole, the Government may reap the savings of not having to transport the prisoner from one institution to another or to bear the costs of his confinement while the Board's decision is pending. It is clear, then, that the Government can put forth no interest approaching "transcending value" to justify not scheduling the hearing so as to avoid unjustified incarceration
 
 
 [14]
 We intimate no view on the question whether the Board is constitutionally required to do so absent a specific request
 
 
 [15]
 See also Cooper v. Lockhart, 489 F.2d 308, 315-16 (8th Cir. 1973); Caton v. Smith, 486 F.2d 733, 735 (7th Cir. 1973) ("Breach of parole conditions is a necessary but not sufficient ground for parole revocation, for the board is required to determine whether the violator is still a good parole risk, and he may bring extenuating factors to the board's attention."). This court repeatedly has recognized that the dispositional determination is separate from the violation determination. See, e. g., Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 240 (en banc ), cert. denied sub nom. Jamison v. Chappell, 375 U.S. 957, 84 S.Ct. 447, 11 L.Ed.2d 316 (1963); Shelton v. United States Board of Parole, supra, 388 F.2d at 575-76. In the Shelton decision, this court noted that an intervening conviction obviated the need for a preliminary "probable cause" parole revocation hearing, 388 F.2d at 575, but did not reach the question whether a final hearing must be held within a reasonable time, 388 F.2d at 576. The reasoning of Judge Gesell in Sutherland v. District of Columbia Board of Parole, supra, 366 F.Supp. at 272, is particularly apposite to this issue:
 The D.C. Board of Parole, like the United States Parole Board under discussion in Shelton, retains full discretion to place a parolee back on the street even though he has clearly violated the conditions of his parole. See D.C.Code § 24-206; 18 U.S.C. § 4207. The Board must consider mitigating circumstances and rehabilitative potential as well as the existence of parole violations before determining that reincarceration is appropriate. . . . Thus, a revocation hearing to adduce evidence on these matters is of vital importance even to a parolee whose parole violation has already been established by a court of law.
 
 
 [16]
 The Parole Board's regulations expressly provide for withdrawal of a detainer lodged against a parolee incarcerated under a new sentence. The pertinent regulation, 28 C.F.R. § 2.53, provides as follows:
 (a) In those instances where the prisoner is serving a new sentence in an institution, the warrant may be placed there as a detainer. Such prisoner shall be advised that he may communicate with the Board relative to disposition of the warrant, and may request that it be withdrawn or executed so his violator term will run concurrently with the new sentence. Should further information be deemed necessary, the Regional Director may designate a hearing examiner panel to conduct a dispositional interview at the institution where the prisoner is confined. . . .
 (b) Following the dispositional review the Regional Director may:
 (1) Let the detainer stand;
 (2) Withdraw the detainer and close the case if the expiration date has passed;
 (3) Withdraw the detainer and reinstate to supervision; thus permitting the federal sentence time to run uninterruptedly from the time of his original release on parole or mandatory release.
 (4) Execute warrant, thus permitting the sentence to run from that point in time. If the warrant is executed, a previously conducted dispositional interview may be construed as a revocation hearing.
 (c) In all cases, including those where a dispositional interview is not conducted, the Board shall conduct annual reviews relative to the disposition of the warrant. . . .
 The common practice apparently is to take alternative (1), and to let the detainer stand. In an affidavit filed with the District Court, Maurice Sigler, Chairman of the United States Board of Parole, reported as follows with regard to the disposition of parole violator warrants lodged as detainers:
 Based on available records, during the last four months of 1973, 30 such cases arose for dispositional review by the Adult Division by the Board. As a result of those dispositional reviews, the Board ordered in 20 cases that the detainer should remain in effect. In 6 cases the Board ordered that the warrant be executed. In 4 cases the Board ordered that the warrant should be withdrawn and the case closed.
 App. 40, 41.
 
 
 [17]
 28 C.F.R. § 2.19 contains a non-exclusive list of ten possible categories of consideration
 
 
 [18]
 Id. § 2.19(b)(2)
 
 
 [19]
 Id. § 2.19(e)
 
 
 [20]
 We note, for instance, that in some cases the Parole Board may provide a revocation hearing reasonably near the place of an alleged violation if the "local" hearing would facilitate production of witnesses or retention of counsel and if the parolee denies that any violation was committed. Id. § 2.55(a). For similar reasons, a parolee incarcerated in a state institution near his home on an intervening sentence may be able to defend himself better in a revocation hearing held at the state institution than at one held after his removal to a federal institution. See Argro v. United States, 505 F.2d 1374 (2nd Cir. 1974)
 
 
 [21]
 The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. . . . And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness
 408 U.S. at 484, 92 S.Ct. at 2601, 33 L.Ed.2d at 496.
 
 
 [22]
 See p. ---- of --- U.S.App.D.C., at 360 of 534 F.2d supra
 
 
 [23]
 See Boswell v. United States Bd. of Parole, 128 U.S.App.D.C. 311 at 315-19, 388 F.2d 567 at 571-75 (one of the appeals consolidated with Shelton v. United States Board of Parole, supra ). In Boswell, the parolee was denied a revocation hearing while imprisoned on an intervening conviction despite the fact that the alleged violation was unrelated to the crime for which he was sentenced. Noting in that situation that "one of the requirements of basic fairness is a prompt hearing where the alleged violator can contest the fact of violation and adduce whatever witnesses or evidence he may have to support his claim of innocence," the court found that the Parole Board was obligated to provide a hearing within a reasonable time:
 We think the issuance of a violator warrant triggers a process which, as a matter of fundamental fairness, must be pursued with reasonable diligence and with reasonable dispatch.
 388 F.2d at 574. Delay may also work unfairness, of course, when it impairs a parolee-prisoner's ability to present collateral evidence in a request for leniency.
 
 
 [24]
 This is so because the Board may reopen a case at any time for further consideration. 28 C.F.R. § 2.28. And as to subjects open to consideration, id. § 2.19 provides in relevant part:
 In the exercise of its discretion, the Board generally considers some or all of the following factors and such others as it may deem appropriate:
 (d) Changes in motivation and behavior:
 (1) Changes in attitude toward self and others;
 (2) Reasons underlying changes;
 (3) Personal goals and description of personal strength or resources available to maintain motivation for law abiding behavior.
 (f) Institutional experience:
 (1) Program goals and accomplishments:
 (i) Academic;
 (ii) Vocational education, training or work assignments;
 (iii) Therapy.
 (2) General adjustment:
 (i) Inter-personal relationships with staff and inmates;
 (ii) Behavior, including misconduct.
 
 
 [25]
 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969)
 
 
 [26]
 See pp. ---- - ---- of --- U.S.App.D.C., 358 of 534 F.2d supra. We also note that the corrosive effect of uncertainty on prisoners has been one of the factors stressed by the increasing number of commentators critical of indeterminate sentences. See, e. g., M. E. Frankel, Criminal Sentences Law Without Order 96-97 (1972) ("(I)t is pertinent again to recall how deeply we prize certainty and predictability in the workings of the law. We want to be able to plan our businesses and family decisions by knowing in advance just how painful the tax will be, what the zoning laws promise, how long an employment contract will endure. It may be imagined that knowing the actual length of a prison term might serve similar . . . needs."); J. Mitford, Kind and Usual Punishment 82 (1973) ("(T)he indeterminate sentence (is) a potent psychological instrument for inmate manipulation and control, the 'uncertainty' ever nagging at the prisoner's mind a far more effective weapon than cruder ones. . . . ")
 
 
 [27]
 See Cooper v. Lockhart, 489 F.2d 308, 314-15 (8th Cir. 1973); Sutherland v. District of Columbia Board of Parole, 366 F.Supp. 270, 272 (D.D.C.1973). See also, Lawrence v. Blackwell, 298 F.Supp. 708, 713-15 (N.D.Ga.1969) (detainers based on pending indictments); Bennett, "The Last Full Ounce," 23 Fed.Prob. No. 2, at 20 (1959); Note, Detainers and the Correctional Process, 1966 Wash.U.L.Q. 417, 421 at n.22
 
 
 [28]
 The new policy contained in Notice 4090 lists twelve "criteria" which will be considered in inmate custody classification: "(a) the nature and seriousness of the offense; (b) sentence structure; (c) prison breach; (d) institutional adjustment; (e) family and community ties and support; (f) prognosis for adjustment in outside institutional assignments and community program (sic); (g) psychological status, mental and emotional stability; (h) pending case; (i) detainer; (j) forfeiture of statutory good time; (k) prison breach (sic; see (c)); (1) disciplinary action."
 That a prisoner may have a substantial interest in the removal of a detainer even when the detainer is only one factor considered by the Parole Board was noted by James V. Bennett, a former Director of the Federal Bureau of Prisons:
 While detainers reduce the incentive for the prisoner to attempt to improve himself, they also affect the institution's readiness to allow an inmate full participation in the program. . . . Today the prisoners with detainers are evaluated individually but there remains a tendency to consider them escape risks and to assign them accordingly. In many instances this evaluation and decision may be correct, for the detainer can aggravate the escape potentiality of a prisoner.
 "The Last Full Ounce," 23 Fed.Prob. No. 2, at 21 (1959).
 
 
 [29]
 The possible consequences of a detainer were outlined in Gay v. United States Board of Parole, 394 F.Supp. 1374, 1377 (E.D.Va.1975):
 First, the presence of the federal detainer imposes substantial constraints upon a parolee's liberty even when the parolee is incarcerated on a state charge. If the parolee is incarcerated while awaiting trial on the state charges, he may be unable to make bond because of the detainer. If the parolee is convicted on the state charge and incarcerated in the state correctional system, he may be denied the privilege of participating in certain rehabilitative programs, such as furlough and work release, because of the presence of the federal detainer. A prisoner with a federal detainer can never be assigned to trusty status, nor assigned to a job where the level of custody is low. . . . The presence of a federal detainer "unquestionably" affects a state prisoner's eligibility for parole.
 
 
 [30]
 The Board argues that Jones' interests in a prompt hearing are reduced because the detainer has been withdrawn and consequently there are no adverse effects from that detainer. We agree that the amount of deprivation suffered by an inmate is less when a detainer has been removed. The interests of the parolee in accuracy, certainty, and possible earlier release, however, remain, and we are persuaded that the Board should not be able to subvert the instant decision by withdrawing a violator warrant that has been issued and reissuing it years later for the same offense
 
 
 [31]
 Preliminarily, we note that the fact that the Board can delay execution does not mean that it will, and presumably there are certain situations in which the Board will find delay inappropriate. For example, the parolee's ability to present a case for prompt execution by the Board may be hampered severely by the effects of delay. Thus, the Seventh Circuit found in United States ex rel. Hahn v. Revis, 520 F.2d 632 (7th Cir. 1975) (mandate withdrawn) (discussed infra ) that a parolee-prisoner may have a substantial interest in a timely opportunity to convince the Board that his sentences should be permitted to run concurrently. We treated this interest in accuracy of the Board's determination at pp. ---- - ---- of --- U.S.App.D.C., 361 of 534 F.2d supra
 
 
 [32]
 See Tippitt v. Wood, 78 U.S.App.D.C. 332, 140 F.2d 689 (1944); Mock v. U. S. Board of Parole, 120 U.S.App.D.C. 248, 345 F.2d 737 (1965)
 
 
 [33]
 Tippitt v. Wood, supra, 140 F.2d at 692; Mock v. U. S. Board of Parole, supra, 345 F.2d at 739
 
 
 [34]
 For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that
 418 U.S. at 560-61, 94 S.Ct. at 2977, 41 L.Ed.2d at 953.
 
 
 [35]
 Compare United States ex rel. Hahn v. Revis, supra, in which a federal detainer was lodged against a state prisoner who was serving both a four-month state sentence for acts done while on parole from the federal sentence, and a longer state term for crimes committed prior to his federal sentence. The Court of Appeals held that the Zerbst case would justify a delay in execution of the detainer only until the four-month "intervening" state sentence was completed:
 In Zerbst v. Kidwell, 304 U.S. 359, 362-63, 58 S.Ct. 872, 82 L.Ed. 1399 (1938), the Supreme Court identified a policy reason why the unexpired term of a parole violator should not begin to run from the date he is "imprisoned for a new and separate offense" so that "a parole violator can be required to serve some time in prison in addition to that imposed for an offense committed while on parole." Although the question presented in Zerbst arose out of an intervening federal sentence, the philosophy expressed would equally justify delay in execution of a federal parole violation warrant until termination of imprisonment for a state offense committed during release on parole. In the instant case, however, petitioner's sentence for the state offense committed on parole was only four months, ending at the latest in October, 1973. The Zerbst philosophy would be irrelevant after that point, since his continued state imprisonment was the result of conduct which took place before his federal sentence was imposed.
 520 F.2d at 636.
 
 
 [36]
 This is, of course, not the case here
 
 
 [37]
 See also Smith v. Hooey, supra, 393 U.S. at 380 n.11, 89 S.Ct. at 578, 21 L.Ed.2d at 612-13, in which the Court rejected a claim that there were practical problems in transporting a prisoner to another state to stand trial on a pending indictment
 
 
 [38]
 28 C.F.R. § 2.53(c), reprinted in pertinent part at note 16 supra
 
 
 [39]
 We recognize that deferring that burden gives the Board the economic advantage of reaping the benefit of use of the funds whose outlay for transportation is delayed, but we believe any interest is de minimis at most and need not be seriously considered
 
 
 [40]
 Because our decision is grounded on considerations of due process, we reject the argument advanced by the Board that the applicable statutes do not grant the right to a hearing until the violator warrant has been executed. This argument proceeds as follows: 18 U.S.C. § 4207 provides that "(a) prisoner retaken upon a warrant issued by the Board of Parole, shall be given an opportunity to appear before the Board" (emphasis added), and the process of "executing" a warrant is defined in 18 U.S.C. § 4206 as "taking such prisoner and returning him to the custody of the Attorney General." Although it is now understood that the "opportunity to appear before the Board" implies a timely opportunity, the statutory requirement arises only when the prisoner is retaken on the warrant, after completion of his intervening sentence
 We have no occasion to decide whether the lodging of a detainer suffices to "retake" the prisoner within the terms of the statute. The issuance of a violator warrant, as we noted in Shelton v. United States Board of Parole, supra, "triggers a process which, as a matter of fundamental fairness, must be pursued with reasonable diligence and with reasonable dispatch." On the balancing of interests presented herein, we find constitutionally impermissible denial of the right to a prompt revocation hearing solely because of intervening incarceration.
 
 
 [41]
 We do not disturb our prior holding that the Board reasonably may await the outcome of criminal charges concerning the acts alleged in the violator warrant. Shelton v. United States Board of Parole, 388 F.2d 567 (1967)
 We reserve, without deciding, the question whether a parole revocation hearing must be held within a reasonable time after a possible parole violation is brought to the Board's attention.
 
 
 [42]
 The Tenth Circuit's position was reaffirmed in Moody v. Daggett, No. 75-1199 (10th Cir. May 7, 1975). In that case, the court, citing Small v. Britton, supra, denied a prisoner's petition for leave to proceed in forma pauperis. The Supreme Court has granted certiorari in that case. --- U.S. ----, 96 S.Ct. 1408, 47 L.Ed.2d 347, 44 U.S.L.W. 3493 (1976)
 
 
 [43]
 Although the Tenth Circuit has concluded that a parolee is not in custody for purposes of 18 U.S.C. § 4207 (1970), it nevertheless recognizes that a parole violator warrant lodged as a detainer represents sufficient custody of purposes of habeas corpus jurisdiction. Small v. Britton, supra
 
 
 [44]
 The Court reasoned as follows:
 In concluding that the deferral of the hearing did not deprive Appellee of any rights prescribed by Morrissey, we emphasize that Appellee has not shown that he was prejudiced by the delay. . . .
 Appellee also contends that he was prejudiced during the term of his intervening sentence in that the presence of . . . a detainer results in the deprivation of certain prison privileges such as trustee status and various educational opportunities. We are unable to conclude on this record that the extent of such deprivation is so great or so unreasonably related to the very existence of a detainer based as it is in this case on a serious and incontestable parole violation as to require that the revocation hearing be held at the commencement of the intervening sentence. . . .
 Appellee also asserts that the deferral of the revocation hearing coupled with the presence of the detainer caused him great anxiety and interfered with the rehabilitation process since it is difficult for a parolee to become motivated while laboring under the uncertain prospect of further imprisonment following completion of his current sentence. We are simply unqualified, unauthorized, and unwilling to second guess the Parole Board on a matter so peculiarly within its own expertise.
 We do not close our eyes to the fact that Appellee may have been disadvantaged in certain respects by the deferral of the revocation hearing but we are unable to conclude that the disadvantage constitutes such a grievous loss in due process terminology as to require the hearing be held prior to service of the intervening sentence or to permit the intrusion by a Court into this highly discretionary activity.
 488 F.2d at 673.
 The Cook holding was reaffirmed in Trimmings v. Henderson, 498 F.2d 86 (5th Cir. 1974), cert. denied 420 U.S. 931, 95 S.Ct. 1135, 43 L.Ed.2d 405 (1975).
 
 
 [45]
 488 F.2d at 673 n. 13
 
 
 [46]
 See pp. ---- - ---- of --- U.S.App.D.C., 374 of 534 F.2d infra for our discussion of the issue whether delay alone justified quashing the warrants in this case
 
 
 [47]
 Judge Duniway filed a dissenting opinion in the Reese case in which he endorsed the positions taken by the Seventh and Eighth Circuits, discussed below. On the importance of evidence in mitigation of the offense, Judge Duniway responded to the majority as follows:
 It is not for us to assume, as the majority opinion does, that a hearing in these cases would be a waste of time because we can conceive of no mitigating circumstances in these cases that would justify lifting the detainer or executing it so as to make the remaining parole term concurrent with the new term. Our discretion is not involved, nor are our notions as to what mitigating circumstances may exist. The discretion belongs to the Board of Parole; so does the decision as to whether there are mitigating circumstances and, if so, what are to be the consequences. . . . Under these circumstances, we have no way of knowing whether the failure to hold a hearing was "prejudicial." To decide that question, we would have to guess what the Board might have done if it had had a hearing. If due process requires a hearing, its denial is prejudicial.
 At p. 237.
 
 
 [48]
 Shortly after the Seventh Circuit announced its decision in Revis, the Government filed a motion asking that court to recall its mandate on the ground that given a conflict among the circuits it was not unlikely that the Supreme Court would grant a petition for certiorari in Gaddy v. Michael, supra, to consider the very issue decided in Revis. The motion was granted on August 27, 1975. No. 74-1057 (Fairchild, C. J.)
 
 
 [49]
 Our reliance on demonstrated prejudice as a factor favoring quashing the warrant is not inconsistent with our earlier observation that prejudice is often difficult to demonstrate and that therefore a prompt hearing is necessary to ensure that the determination reflects a full and accurate presentation of all relevant evidence. That observation illustrates the importance of holding a prompt hearing, the failure to do so in the future will be amenable to the remedy of a judicial direction that a hearing be held. The remedy of quashing intrudes on Government interests much more severely than the remedy of providing the hearing, for it deprives the Government of its normal discretion in parole matters
 
 
 [50]
 The structure of the hearing should be based upon the structure of the revocation hearing outlined in Morrissey, see 408 U.S. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499, as amplified by more recent decisions of the Supreme Court and this court
 
 
 [51]
 A "reasonable time" in this instance may, of course, reflect any realistic difficulties encountered in dealing with a temporary increase in the number of hearings which must be conducted following this opinion